J-S12011-18
J-S12012-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: R.H. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1661 MDA 2017 |

Appeal from the Order Entered September 29, 2017
In the Court of Common Pleas of Cumberland County Juvenile Division at
No(s):  CP-21-DP-0000167-2015

| | | |
|---|---|---|
| ADOPTION OF: A.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: R.W. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1671 MDA 2017 |

Appeal from the Decree Entered September 29, 2017
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  002-ADOPT-2017

BEFORE:  LAZARUS, J., KUNSELMAN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY LAZARUS, J.:                    **FILED MARCH 23, 2018**

R.W. ("Father") appeals from the trial court's permanency review order

changing the goal from reunification to adoption[1] and the decree involuntarily

_____

[1] The permanency order is final and appealable.  **_See In re H.S.W.C.-B._**, 836 A.2d 908 (Pa. 2003) (order granting or denying goal change is appealable).

terminating his parental rights to his minor daughter, A.L. ("Child") (born 8/15).[2]  After careful review, we rely upon the trial court's opinion, authored by the Honorable Christylee L. Peck, in affirming the permanency review order and termination decree.

Based on Mother's[3] mental instability and erratic behavior in the hospital following Child's birth, Child came under court supervision out of fear for Child's physical safety and welfare.  Child was adjudicated dependent in October 2015 and placed in the custody of Cumberland County Children and Youth Services ("CYS").  Child was placed in foster care in November 2015; at the time, Father's whereabouts were unknown.  In February 2016, Child was placed in a formal kinship home with a pre-adoptive foster family, with whom she remains to date.[4]

Father was not located until late 2016; a paternity test confirmed he was Child's biological father in February 2017.  CYS developed a Family Service Plan ("FSP") for Father that consisted of the following:  (1) obtain and maintain adequate and safe living conditions; (2) participate in parenting skills

_____

[2] We have consolidated Father two separate appeals, filed at 1661 MDA 2017 and 1671 MDA 2017, as they involve the same parties and related issues. **See** Pa.R.A.P. 513 (Consolidation of Multiple Appeals).

[3] Mother voluntarily consented to the termination of her parental rights with regard to Child.  She is not a party to this appeal.

[4] At the goal change/termination hearing, the foster family indicated that they are willing to adopt Child and would permit Father to visit Child.  N.T. Goal Change/Termination Hearing, 9/27/17, at 47.

assessments and follow-up with any recommendations; (3) address drug and alcohol concerns; (4) perform random drug screens through CYS; (5) maintain stable employment; (6) obtain a mental health evaluation; and (7) visit with Child through Alternative Behavioral Consultants ("ABC"). When Father continued to make only minimal progress on his FSP goals, CYS filed a petition to terminate Father's parental rights pursuant to sections 2511(a)(2) & (b) of the Adoption Act.[5]

On September 27, 2017, the court held a goal change/termination hearing. After the hearing, the court entered a permanency review order changing the current goal from reunification to adoption based on the following findings: Father had minimally complied with his FSP and made minimal progress toward alleviating the circumstances that led to Child's placement; while Father completed a drug and alcohol evaluation, he had yet to complete a FAST[6] evaluation through ABC; Father had not yet begun

_____

[5] 23 Pa.C.S. §§ 2101-2910.

[6] A FAST evaluation is a parental fitness evaluation. It is defined as a:

> [F]orensic, multi[-]faceted evaluation that couples both a psychological exam, identifying emotional or intellectual barriers a parent may exhibit, with additional objective measures to assess parental risk and skill levels. This evaluation includes a minimum of two parent/child observations and collateral contacts with other service providers, or individuals connected to the parent in some way as to offer insight into historic behaviors. The objective of this evaluation is to get a comprehensive forensic evaluation of a parent['s] strengths and needs, typically used to determine the parental capabilities to assist in custodial matters. . . . [I]t merely

parenting classes; while Father visited with Child weekly and was cooperative with agency personnel, he had also missed some visits with Child and had failed to notify ABC in advance; the permanency plan developed for Child in August 2017 was no longer appropriate or feasible; and Child had been in placement for 15 of the last 22 months. At the conclusion of the hearing, the court also entered a final decree terminating Father's parental rights to Child.

Father filed a timely notice of appeal from both the order and decree as well as a Pa.R.A.P. 1925(a)(2) concise statement of errors complained of on appeal. He presents the following questions for our review:

(1) Whether the trial court erred as a matter of law in finding that Father had made minimal progress toward alleviating the circumstances that necessitated the original placement of the Child?

(2) Whether the trial court erred as a matter of law in finding that the Cumberland County Children and Youth Agency had met its burden of proof in determining that reasonable efforts to place the Child with Father had ultimately failed and it was appropriate to change the goal to adoption?

(3) Whether the trial court erred as a matter of law and abused its discretion in finding that the Cumberland County Children and Youth Agency had proven by clear and convincing evidence the grounds for termination of [Father's]

---

offers information about a parent['s] strengths and needs and recommendations to support reunification goals.

*See* http://alternativebehaviorconsultants.com/psychological-evaluations-and-assessements (last visited Feb. 28, 2017).

[p]arental [r]ights under Section 2511[7] of the Adoption Act?

(4) Whether the trial court erred as a matter of law and abused its discretion in finding that termination of [Father's] parental rights best served the developmental, physical and emotional needs of the Child pursuant to 23 Pa.C.S. § 2511(b)[8]?

Father's first two issues concern the trial court's permanency order changing the goal from reunification to adoption. In particular, he claims that the court erred when it determined he had made minimal progress toward

_____

[7] Pursuant to section 2511(a)(2):

(a) General rule. — The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

[8] Pursuant to section 2511(b):

(b) Other considerations. — The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

alleviating the circumstances that necessitated the original placement of Child and in finding that CYS had met its burden of proving that reasonable efforts to place the Child with Father had ultimately failed and it was appropriate to change the goal to adoption.

The standard of review of a court's permanency determination is as follows:

> In cases involving a court's order changing a court-ordered goal to adoption, an appellate court's standard of review is abuse of discretion. To hold that the trial court abused its discretion, an appellate court must determine its judgment was manifestly unreasonable, that the court disregarded the law, or that its action was a result of partiality, prejudice, bias or ill will. While an appellate court is bound by the facts determined in the trial court, the appellate court is not tied to the court's inferences, deductions and conclusions; the appellate court has a responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Therefore, an appellate court's scope of review is broad.

*In the Interest of L.T.*, 158 A.3d 1266, 1276 (Pa. Super. 2017) (citation omitted). In a change of goal proceeding, the best interests of the child, and not the interests of the parent, must guide the trial court, and the parent's rights are secondary. *In the Interest of D.P*., 972 A.2d 1221 (Pa. Super. 2009). Likewise, this Court has held, "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003).

Here, the trial court correctly disposes of Father's issues with regard to changing the goal to adoption where: (1) CYS made reasonable efforts to

identify, locate, work with, and provide services to Father to aide in the reunification process; (2) Father was uncooperative with CYS and service providers in working toward his FSP goals; (3) Father missed agency visits with Child; (4) Father did not take advantage of the opportunity to visit with Child through the foster family; (5) Father has failed to make sufficient progress in his relationship with Child over seven months; and (6) Child is thriving in her pre-adoptive foster home with loving parents she considers her mom and dad. **See** Trial Court Opinion, 11/30/17, at 15-18.

In his final two issues on appeal, Father contends that CYS failed to prove, by clear and convincing evidence, that his parental rights should be terminated under sections 2511(a) and (b) of the Adoption Act. In particular he asserts that termination does not best serve Child's developmental, physical and emotional needs. We disagree.

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

***In re Adoption of S.M.***, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation omitted). ***See also In re C.P.***, 901 A.2d 516, 520 (Pa. Super. 2006) (party seeking termination of parental rights bears burden of proving by clear and

convincing evidence that at least one of eight grounds for termination under 23 Pa.C.S. § 2511(a) exists and that termination promotes emotional needs and welfare of child set forth in 23 Pa.C.S. § 2511(b)).

Again, we rely upon the well-written opinion, authored by Judge Peck, in concluding that termination of Father's parental rights under section 2511(a)(2) was proper where Father: (1) failed to progress appropriately in his FSP goals; (2) did not maintain contact with Child's foster family between scheduled agency visits; (3) did not complete ordered parenting classes and psychological evaluation; (4) was unable to progress to unsupervised visits; and (5) has not demonstrated that he is capable of providing a safe and stable environment in which to parent Child. *See* N.T. Goal Change/Termination Hearing, 9/27/17, at 10-13.

Termination was also proper under section 2511(b) where: (1) evidence suggests Father chose not to be involved in Child's early life; (2) Father was unable to develop a bond with Child as a result of missed visits and failure to progress to unsupervised visits; (3) Child is not bonded to Father; (4) Child has strong bond with pre-adoptive foster family where she is living in a safe and happy environment; (5) foster family is willing to permit Father to maintain contact with Child; and (6) Child needs permanency and stability in her life. *Id.* at 12-13.

The parties are directed to attach a copy of Judge Peck's Rule 1925(a) opinion in the event of further proceedings in the matter.

Order and decree affirmed.

J-S12011-18
J-S12012-18

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 03/23/2018

IN THE INTEREST OF A.L., : IN THE COURT OF COMMON PLEAS OF
     a Minor, : CUMBERLAND COUNTY, PENNSYLVANIA
     D.O.B. 08/ ; /15 :
      :
Appeal of R.H., Father : CP-21-DP-0000167-2015

## OPINION PURSUANT TO PA.R.A.P. 1925

Peck, J., November 30, 2017 –

On October 5, 2015, A.L. was adjudicated dependent after being under Court supervision since August 2015.[1] On November 20, 2015, A.L. was placed into foster care.[2] On December 22, 2016, Cumberland County Children and Youth Services (CCCYS, or the Agency), by and through its solicitor, Lindsay D. Baird, Esquire, filed a Petition to Schedule a Goal Change Hearing.[3] On April 13, 2017, the Agency, by and through Ms. Baird, filed a Petition for Involuntary Termination of Parental Rights of Father, R. ; ; W. ; .[4] A Goal Change and Termination of Parental Rights Hearing was scheduled for September 29, 2017.[5] After the hearing and consideration of the evidence, this Court issued a Permanency Review Order changing the Child's goal to adoption and a Final Decree terminating the parental rights of Appellant on September 29, 2017.[6] On October 27, 2017, Appellant filed a Statement of Errors Complained of on Appeal, complaining that:

> 1. The Honorable Court erred as a matter of law and abused its discretion in finding that the Cumberland County Children and Youth Agency had proven by clear and convincing evidence the grounds for termination of

---

[1] CCCYS Exhibit No. 1, Master's Recommendation for Adjudication and Disposition – Child Dependent, 1, September 29, 2017.

[2] CCCYS Exhibit No. 1, Ex Parte Order for Emergency Custody, September 29, 2017.

[3] Petition for Goal Change Permanency Hearing, December 22, 2016.

[4] Re: Petition for Involuntary Termination of Parental Rights of Father, ! ____ ____ under Section 2512 of the Adoption Act, April 13, 2017.

[5] Order of Court, June 21, 2017 (Peck, J).

[6] Permanency Review Order, Dependency Docket No. CP-21-DP-0000167-2015, 2, September 29, 2017 (Peck, J.); RE: Petition for Involuntary Termination of Parental Rights of Father, R. . W. Under Section 2512 of the Adoption Act, Final Decree, September 29, 2017 (Peck, J.).

29

Appellant's Parental Rights under Section 2511 of the Adoption Act.

2. The Honorable Court erred as a matter of law and abused its discretion in finding that termination of the Appellant's parental rights best served the developmental, physical and emotional needs of the Child pursuant to 23 Pa.C.S. § 2511(b).

3. The Honorable Court erred as a matter of law in finding that the Cumberland County Children and Youth Agency had met its burden of proof in determining that reasonable efforts to place the Child with Father had ultimately failed and it was appropriate to change the goal to adoption.

4. This Honorable Court erred as a matter of law in finding that Father had made minimal progress toward alleviating the circumstances that necessitated the original placement of the Child.[7]

Pursuant to Pa.R.A.P: 1925(a), this opinion is written in support of this Court's judgment.

## STATEMENT OF FACTS

### a. Background

Appellant is the biological father of A.L., born August    2015. A.L. was adjudicated dependent on October 5, 2015 and placed into foster care on November 20, 2015 due to Mother's mental instability[8] and concerns over the physical safety of the Child while in Mother's care.[9] A.L. had been living with her Mother under Court supervision for approximately two months at the time she was adjudicated dependent.[10]

---

[7] Appellant's Statement of Errors Complained of on Appeal, October 27, 2017.

[8] Mother has been diagnosed with PTSD, ADHD, ADD, OCD, depression, and bi-polar disorder. See Transcript of Proceedings, In Re: Permanency Review Hearing, September 29, 2017 (Peck, J.) (hereinafter, "N.T. at __") at 14; See also CCCYS Exhibit No. 2, Dependency Petition dated 08/24/15, 1, September 29, 2017.

[9] Mother was not providing appropriate supervision for the Child in the home, and there were concerns about domestic violence among Mother, Mother's paramour, and maternal great-grandmother. Mother later reported to the Agency that her paramour, during a domestic violence incident, had thrown 5-month-old A.L. onto a bed by her arm. The Child was taken to the hospital, and was not reported to have any injuries resulting from the incident. Due to this incident and concerns about Mother's unstable mental health condition and possible drug use in the home, the Child was removed from Mother's care.

[10] The Agency first became involved with the family due to Mother displaying concerning, erratic, and volatile behaviors in the hospital after A.L.'s birth. She scratched at and spit on a nurse, hit her mother, and threw her phone at a window while engaging in a loud verbal altercation with her paramour. Due to

30 2

The Agency did not know of Father's identity at the time that the Child was placed with alternate caregivers, and Mother's family members were not an appropriate resource for the Child.[11] A.L. was initially placed with temporary foster parents, then was moved to the kinship foster home of family friends, J⸱  and J⸱  ; T⸱  , on February 3, 2016.[12] A.L.'s current caregivers are a pre-adoptive resource.[13] A.L. has remained in placement since November 2015, which at the time of the termination hearing had been over twenty-two months.

In November 2015, a permanency plan and family service plan were put in place with the goal of family reunification.[14] Appellant was not included in either of these plans, as his identity remained unknown. Early on in the dependency action Mother had put forth the name of Appellant as a potential father, but the Agency was unable to locate Appellant until late 2016.[15] In December 2016, Appellant submitted to a DNA test, and was proven to be the biological father of A.L. in February 2017.[16] Once Appellant was identified as the father, the Agency began making efforts toward reunification.[17] The Agency developed a revised Family Service Plan to include Appellant on March 10, 2017.[18] Appellant was referred for a FAST evaluation[19] and guided visitation through

---

observations of Mother not paying attention to the safety of the Child in the hospital, it was decided that she would not be discharged with the Child without appropriate supervision in place.

[11] Mother initially told the Agency that the Child was conceived by rape. Mother's grandmother and paramour were not considered appropriate resources for the Child because of their involvement with the Agency.

[12] Order Regarding Modification of Child's Placement, Dependency Docket No. CP-21-DP-0000167-2015, February 2, 2016 (Peck, J.).

[13] See Report of Intention to Adopt, September 20, 2017.

[14] See CCCYS Exhibit 3, Child's Permanency Plan, September 29, 2017; CCCYS Exhibit 4, Family Service Plan dated 11/25/2015, September 29, 2017.

[15] N.T. at 55-56, 58.

[16] N.T. at 56.

[17] N.T. at 56, 72.

[18] CCCYS Exhibit 4, Family Service Plan dated 3/10/2017, September 29, 2017.

[19] A FAST evaluation is a forensic, multi-faceted evaluation that includes a psychological examination which identifies emotional or intellectual barriers a parent may exhibit, coupled with additional objective measures to assess parental risk and skill levels. It includes at least two parent/child observations and collateral contacts with other service providers or individuals connected to the parent in order to offer insight into historic behaviors. The objective is to determine the parent's strengths, needs, and ability to assist in custodial matters, and to offer a recommendation to support reunification goals. See *Individual and Family Services – Evaluations and Assessments: FAST Evaluation,*

Alternative Behavior Consultants (hereinafter, "ABC") pursuant to the revised plan.[20] Between March and June 2017, numerous efforts were made toward completing Appellant's FAST evaluation; however, Appellant's evaluation referral was ultimately closed by ABC on June 28, 2017 for non-cooperation.[21] Between March and August 2017, Appellant engaged sporadically in guided visitation at the ABC facility with A.L.[22] On August 16, 2016, Appellant's guided visitation was changed to the STEPS program, which is a less restrictive form of visitation between parent and child.[23]

Appellant has a criminal history spanning more than a decade. Appellant was incarcerated for a weapons violation in 2001.[24] Father has pled guilty to several DUIs, Public Drunkenness, and possession of marijuana in the past.[25] At the time of the hearing, Father was on probation for a DUI from 2016, and will remain on probation until 2018.[26] Appellant currently does not have a driver's license and is not expected to be able to get his driver's license back until at least 2018.[27]

Appellant has three other children, none of which he exercises custody over. Appellant testified that all three of his children live with their mothers out-of-state, and he does not see them often.[28] Appellant has a 21-year-old who lives in New York, and a four-year-old and five-year-old who live in Georgia.[29] Appellant testified that he has not

---

ALTERNATIVEBEHAVIORCONSULTANTS.COM (October 20, 2017), http://alternativebehaviorconsultants.com/psychological-evaluations-and-assessements/ (defining FAST evaluation).

[20] CCCYS Exhibit 4, Family Service Plan dated 3/10/2017, September 27, 2017.

[21] N.T. at 20-24, 27.

[22] N.T. at 29, 32-34.

[23] N.T. at 29.

[24] N.T. at 103.

[25] See CCCYS Exhibit No.6, Criminal Dockets for Father, September 27, 2017. There was some dispute in the record as to how many DUIs for which Father had been convicted. See N.T. at 55; but see N.T. at 63, and cf. N.T. at 66 and 74. Father was convicted of Public Drunkenness in 2010. N.T. at 66, 75. Father was convicted of possession of marijuana in 2012.

[26] N.T. at 53, 55, 65, 74, 76.

[27] N.T. at 67, 75-76.

[28] N.T. at 98-99, 101, 103.

[29] N.T. at 98-99.

visited his two younger children in a year and a half, and does not provide any daily care for them.[30]

The Agency no longer believes that reunification is the best option for A.L. and initiated the process to terminate Appellant's parental rights and allow A.L. to be adopted.[31] A ~~and~~ ~~to~~ filed a Report of Intention to Adopt on September 20, 2017.[32] A Goal Change and Termination of Parental Rights Hearing was held on September 27, 2017. The following pertinent information was presented at the hearing:

b. Appellant's Status at Time of Goal Change and Termination Hearing

The CCCYS caseworker, Mr. Jordan Luther, testified about the goals the Agency had developed for Appellant and his adherence to those goals. The following goals were put in place: (1) to obtain and maintain adequate and safe living conditions; (2) to improve parenting skills, including a FAST evaluation; (3) to address drug & alcohol concerns; (4) to maintain stable employment; and (5) to follow recommendations from his mental health evaluation.[33] Mr. Luther testified that Appellant has stable housing and employment,[34] has consistently given negative drug screens when tested by the Agency, and that he has substantially participated in the required visitation with A.L.[35] However, Appellant has not engaged in any parenting classes, has not completed his FAST assessment, and has only partially complied with the mental health evaluation requirement.[36]

Appellant has been inconsistent in meeting his goals; he participates in visitation with A.L., but frequently will be unavailable for visits or contact with ABC.[37] Ms. Linda

---

[30] N.T. at 102-03.

[31] See Petition for Goal Change Permanency Hearing, December 22, 2016; Re: Petition for Involuntary Termination of Parental Rights of Father, Raheim Williams, under Section 2512 of the Adoption Act, April 13, 2017.

[32] Report of Intention to Adopt, September 20, 2017.

[33] N.T. at 51-54.

[34] Appellant lives in Carlisle with his paramour. Mr. Luther stated that Appellant's employment may not be stable, however, as he had worked for at least two different employers in the calendar year.

[35] N.T. at 51-53, 67.

[36] N.T. at 52-53, 55, 65.

[37] N.T. at 20-21, 23-24, 32-34, 38.

Mapes, the visit supervisor for ABC, testified that Appellant had visitation with the Child one time per week for two hours, and also had the ability to have supervised visitation with the child in the community as the parties arranged.[38] Appellant has had 20 visits with the Child at ABC since March 2017.[39] On five occasions, someone else attended the visit with Appellant, which made it difficult for the supervisor to see Appellant independently interact with the Child.[40] Appellant cancelled his first visit, no-showed for two visits,[41] and missed all his scheduled visits between May 31, 2017 and June 21, 2017 without providing ABC with an explanation.[42] Although Appellant does interact appropriately with the Child and the Child feels comfortable around Appellant, there does not appear to be a parental bond between the Child and Appellant.[43] Appellant also exhibits odd behaviors during the visits, such as looking out the window and talking to himself.[44] Mrs. T    the foster mother, testified that Appellant has never called to arrange community visitation with A.L., and that he has never called to ask about A.L. between visits.[45] Since the Child has been placed with the T    , there have been only three community visits with Appellant, and Appellant had not contacted the T     to arrange any visits in the three months prior to the hearing.[46]

Appellant has not completed his goal of obtaining a FAST assessment. Ms. Andee Warner, Appellant's FAST evaluator, testified to Appellant's seemingly odd behaviors and difficulty to work with during FAST evaluation sessions. Ms. Warner initially met with Appellant on April 24, 2017, and scheduled an initial appointment at his residence for May 3, 2017.[47] Following this date, Appellant no-showed for two scheduled follow-

---

[38] N.T. at 29, 31.
[39] N.T. at 29.
[40] Appellant's girlfriend, Appellant's mother, or the Child's Mother attended the visits. N.T. at 30-31.
[41] Father most recently no-showed in the beginning of September, 2017.
[42] N.T. at 32-34, 36.
[43] N.T. at 34-35, 37.
[44] N.T. at 37.
[45] N.T. at 40-42. Appellant refuted this testimony, complaining that the T    do not invite him to events involving A.L. (e.g., her 2nd birthday party), and that his mother calls the foster mother to arrange the community visits because "a woman can speak to a woman." N.T. at 88-89.
[46] N.T. at 41-42.
[47] N.T. at 20.

up appointments on May 25 and June 1, 2017, and was late for his appointment scheduled for June 23, 2017.[48] Ms. Warner stated that on the occasions she did meet with Appellant, he talked to himself and seemed very paranoid and agitated.[49] Appellant eventually refused to work further with ABC, so the evaluation referral was closed on June 28, 2017.[50] Appellant received a mental health evaluation at his own prerogative, but did not give the evaluator all the necessary information in order to complete that portion of the FAST assessment.[51] Due to not completing the prerequisite mental health and parenting skills evaluations, Appellant was unable to have any unsupervised visits with the child.[52]

Mr. Luther testified that Appellant is very paranoid, and believes that the system (the Court, the Agency, and ABC) is prejudiced and wants to keep A.L. away from him.[53] Appellant's efforts to parent have been inconsistent, and although he gets along well in a controlled and supervised setting, there has been no opportunity for the Agency thus far to see how he can handle parenting on his own.[54] As of the time of the hearing, Mr. Luther believed that Appellant would not be able to properly care for A.L. if he were to have custody of her.[55]

Appellant does not attend medical appointments for the child or take care of the child's daily needs.[56] Appellant has not taken advantage of the opportunity to participate in parenting education, because he has refused to cooperate with ABC in completing his FAST assessment. As of the time of the termination hearing, Appellant was not seeking or attending any counseling for possible mental health concerns, or having consistent contact with the child.[57]

---

[48] N.T. at 21.
[49] N.T. at 24, 26.
[50] N.T. at 27.
[51] N.T. at 22-23, 26.
[52] N.T. at 52, 55, 65.
[53] N.T. at 52, 59-60.
[54] N.T. at 43, 46, 68-69.
[55] N.T. at 67.
[56] N.T. at 43, 49, 110.
[57] N.T. at 87.

Appellant testified that he wants to have custody of his daughter. Specifically, Appellant stated that he had no idea that A.L. existed until the end of 2016 when he was informed by family members that he may be the father, and was subsequently confirmed by a DNA paternity test to be the father of A.L. in February 2017.[58] Appellant has remained in contact with the Agency by riding his bike to the CCCYS office or calling the caseworker on the phone about once a week.[59] Appellant has a crib for A.L. and his residence is set up in such a way as to accommodate her.[60] Appellant brings cards and toys to visits with A.L.[61] Appellant contends that he only ever missed two visits with A.L., and that he informed the Agency in advance both times of his reason for missing the visit.[62] Appellant also insists that ABC cancelled the visits between May and June 2017 because the foster family went on vacation, and not because of anything he did.[63] Appellant testified that he recorded the visits at ABC because he wanted evidence that the visit supervisor was taking time out of his visit to play with A.L. herself.[64] Appellant denied he missed any scheduled appointments for a FAST evaluation at ABC.[65] Appellant has no formal diagnosis of any mental health issue, and does not believe he needs to seek counseling or treatment.[66] Appellant believes that he has done everything he can in order to form a relationship with A.L., and just needs more time to form the

---

[58] N.T. at 71-72. Mother gave testimony refuting that Father did not know of his possible paternity. Mother testified that she told Appellant about the child on December 16, 2014 and thereafter informed him of the child's due date. At that time, he denied he was the father and refused to sign the child's birth certificate because he did not want to pay child support. N.T. at 132-134.

[59] N.T. at 72. Mr. Luther stated that Appellant often came to the Agency to do drug tests or called to complain about ABC. N.T. at 57-59.

[60] N.T. at 51, 73.

[61] N.T. at 49-50, 89.

[62] N.T. at 77-78.

[63] N.T. at 79-80.

[64] N.T. at 80-81.

[65] N.T. at 86.

[66] N.T. at 87. Dr. Thomas, the psychologist who performed Appellant's mental health assessment, opined that Appellant showed signs of ADHD and a learning disability during their interaction. However, the assessment given to Appellant was meant to be a "general evaluation with respect to his overall fitness with regard to his ability to see his daughter" and was not meant to give Appellant any type of mental health diagnosis. Dr. Thomas admitted he did not have certain information related to Appellant that may have aided in a diagnosis, such as Appellant's criminal history and information from other sources besides Appellant himself. N.T. at 114-17, 124-25.

bond; he believes the Agency did not give him the chance to reunify with her before beginning the process to terminate his rights.[67]

The Agency's primary concern was that due to Appellant's inconsistent efforts to parent and the amount of time he has spent away from the Child, he has not proven himself ready to take on the parenting role for A.L. thus far. The Agency also raised concerns that Appellant had not made progress on his goals to improve his parenting skills, obtain treatment for any mental health condition, or maintain consistent contact with the child. In the Agency's view, A.L. needs stability and permanency, which Appellant is not ready to provide.

### c. A.L.'s Status at the Time of the Hearing

A.L. is a 2-year-old child in need of permanency. A.L. has been under the care of caregivers other than her parents for the vast majority of her life. Appellant has never been involved in the child's medical care or care of her daily needs, and only became acquainted with her approximately six months prior to the instant Hearing, when the Child had already been in substitute care for over sixteen months.

Multiple parties testified that although A.L. is comfortable interacting with Appellant at visits, she has not formed a parent-child bond with him; instead, the child considers the T       to be her parents and is well-bonded with the T      family.[68] Since the child is so young and has not spent any part of her life under her father's care, this Court found that she would not be negatively affected by a termination of Appellant's parental rights. In addition, the child's caregivers are family friends of Mother, and testified that they are willing to maintain contact and have visits with the child's biological family on both sides.[69]

---

[67] N.T. at 89-94.
[68] N.T. at 30-31, 34-35, 37, 43, 46-49. The Child has lived with the T      continuously since she was 4 ½ months old, and has also formed a sibling bond with the T      s daughter..
[69] N.T. at 47.

With regards to the potential adoptive family, the T___ provide a loving and stable home for the Child.[70] A.L. is doing well in her kinship foster home, and being developmentally on track, does not require any special services.[71] The T___ are prepared to adopt A.L., and plan to keep in contact with the child's natural parents and extended families. There is a very strong and loving bond between the child and her caregivers. Appellant's own mother, when questioned at the hearing, conceded that the caregivers were taking good care of A.L.[72] The Child's guardian *ad litem* was in agreement with the Agency that Appellant's rights should be terminated so that the T___ may adopt A.L.

After the hearing, this Court issued an Order changing the Child's permanency goal to adoption and a Final Decree terminating the parental rights of Appellant on September 27, 2017. On October 27, 2017, Appellant filed his Statement of Errors Complained of on Appeal.

## DISCUSSION

The Appellant has alleged that:

1. The Honorable Court erred as a matter of law and abused its discretion in finding that the Cumberland County Children and Youth Agency had proven by clear and convincing evidence the grounds for termination of Appellant's Parental Rights under Section 2511 of the Adoption Act.
2. The Honorable Court erred as a matter of law and abused its discretion in finding that termination of the Appellant's parental rights best served the developmental, physical and emotional needs of the Child pursuant to 23 Pa.C.S. § 2511(b).
3. The Honorable Court erred as a matter of law in finding that the Cumberland County Children and Youth Agency had met its burden of proof in determining that reasonable

---

[70] N.T. at 14, 48.
[71] N.T. at 43, 49. Speech therapy has been discontinued because an Early Intervention assessment determined that the child is within the verbal range for her age group, and no continuing services have been recommended.
[72] N.T. at 129.

efforts to place the Child with Father had ultimately failed and it was appropriate to change the goal to adoption.

4. This Honorable Court erred as a matter of law in finding that Father had made minimal progress toward alleviating the circumstances that necessitated the original placement of the Child.[73]

This Court begins by addressing the standard of review applicable to the Appellant's claims. Pennsylvania appellate courts defer to the trial courts, "adher[ing] to the view that the trial court is in the best position to determine credibility, evaluate the evidence, and make a proper ruling." In re Adoption of Atencio, 650 A.2d 1064, 1066 (Pa. 1994). Absent an abuse of discretion or error of law, where the trial court's findings are supported by competent evidence, an appellate court must affirm the trial court even though the record could support the opposite result. In the Interest of R.J.T., 9 A.3d 1179, 1190 (Pa. 2010). Pennsylvania courts have held that "an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." In re Adoption of S.P., 47 A.3d 817, 826 (Pa. 2012) (internal citations omitted).

When evaluating a petition for termination of parental rights, the court must conduct a two-part analysis. First, the Court must determine if the Agency has proven that at least one of the statutory grounds of termination set out in 23 Pa.C.S.A. §2511(a) has been met. See In re B.L.W., 843 A.3d 380, 384 (Pa. Super. 2004) (en banc). Then, the court must evaluate whether the termination is in the best interest of the child, as required by 23 Pa.C.S.A. §2511(b). Id. The burden is on the Petitioner to prove by clear and convincing evidence[74] that the asserted grounds for seeking the termination of parental rights are valid. In re R.N.J., 985 A.2d 273, 276 (Pa. Super. 2009).

---

[73] Appellant's Statement of Errors Complained of on Appeal, October 27, 2017:

[74] "Before terminating a parent's rights, the trial court must receive testimony 'that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" In re Adoption of A.C., 162 A.3d 1123, 1133 (Pa. Super. 2017) (quoting In re Adoption of Atencio, 650 A.2d 1064, 1066 (Pa. 1994)).

39

Here Appellant argues that the Agency has failed to meet the statutory grounds for termination of parental rights under 23 Pa.C.S.A. §2511(a), and has failed to prove under 23 Pa.C.S.A. §2511(b) that termination was in the Child's best interests. Appellant also argues that the Agency did not meet its burden to prove that a goal change to adoption was appropriate. This Court believes that because competent evidence supports its decision, the rulings should stand.

a. Sufficiency of Evidence of Statutory Ground under 23 Pa.C.S.A. §2511(a)

The fulfillment of any one subsection of § 2511(a) satisfies a threshold sufficient for the court to proceed to evaluate the best interest of the child under 23 Pa.C.S.A. §2511(b). In re B.L.W., 843 A.3d 380, 384 (Pa. Super. 2004)(en banc). The Agency's Petition alleged that the statutory grounds for termination were met under 23 Pa.C.S.A. §2511(a)(2). On appeal, Appellant's claim is that this Court erred because there was not clear and convincing evidence to support termination of his parental rights. With this argument, Appellant contends the Agency has not met the standard for termination under 23 Pa.C.S.A. §2511(a)(2). This section allows for termination of parental rights under the following conditions:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. §2511(a)(2).

In this case, A.L. was placed into foster care in November 2015 due to concerns that Mother's untreated mental health, possible drug use in the home, and domestic violence was creating an unsafe home for A.L.[75] At this time, Appellant was identified by the Mother but could not be reached by the Agency, despite numerous efforts to do so, to

---

[75] See CCCYS Exhibit No. 1, Master's Recommendation for Shelter Care dated 11/23/15, September 29, 2017.

begin the reunification process. There was credible testimony by Mother that Appellant knew he was the potential father of A.L. during Mother's pregnancy, and that Appellant at that time and in the time prior to February 2017 refused to take on a parenting role. In fact, Appellant only came forward as a potential resource after he learned that the Child was in foster care and that a different potential father had been eliminated through DNA testing.[76] At that point, the Child had already been in foster care for thirteen months.

Once Appellant was confirmed as the biological father of A.L., Appellant agreed to a service plan that required him to have consistent contact with the Child, comply with drug and alcohol and mental health evaluations and recommendations, and participate in courses that would improve his parenting skills. The record shows Appellant did not make the required progress on his goals, was inconsistent in his efforts to visit with and contact the child, and that he is still not ready to be the primary caretaker of A.L. after having more than six months of reasonable services provided to him by the Agency. This Court notes that the purpose of the family service plan the Agency and the Appellant have agreed to is to reunify the Father with the child and transition to full-time care, and Father's lack of progress on his goals make this transition impossible.

Viewing the record as a whole, this Court agrees with the Agency's assessment that Appellant has not proven himself capable, thus far, of providing safe and stable primary care essential to the child's well-being. While Appellant testified to his commitment to being in his daughter's life, his pattern of non-cooperation with ABC, lack of progress on his service plan goals, cancelling or no-showing for visits with A.L., and not maintaining contact with A.L.'s caregivers or A.L. in the times between scheduled visits show that he is not ready to take on the full-time care of his daughter. While the Agency, the guardian *ad litem*, and indeed, even A.L.'s current caregivers have provided Appellant with ample time to form a relationship with A.L. and prove himself capable of providing safe and stable parental supervision for the child, he has not achieved that goal. This Court found the Agency has shown that the Appellant's repeated neglect has caused the Child to be without essential parental care and control, that

---

[76] N.T. at 111-12.

Appellant has made minimal progress to relieve the conditions of neglect, and that Appellant has not been able to provide the Child with the care and control she needs within a reasonable period of time despite opportunities to do so.

With the substantive requirements of 23 Pa.C.S.A. §2511(a)(2) fulfilled, this Court found the Agency had proven by clear and convincing evidence that a ground for termination under 23 Pa.C.S.A. §2511(a) was met. This Court now turns to analysis under 23 Pa.C.S.A. §2511(b), which looks to the best interests of the child.

b. Sufficiency of Evidence that Termination of Parental Rights was in the Child's Best Interest

Having found the Agency proved a statutory ground for termination under 23 Pa.C.S.A. §2511(a), this Court turned to consider the best interest of the child under 23 Pa.C.S.A. §2511(b). In re B.L.W., 843 A.3d 380, 384 (Pa. Super. 2004) (*en banc*). The standard requires the court "to give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. §2511(b). Furthermore, "the rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent." Id. However, the courts have stated that the emotional needs and welfare of the child have properly been interpreted to include "intangibles such as love, comfort, security, and stability." In re K.M., 53 A.3d 781, 791 (Pa. Super. 2012). When making a Section 2511(b) determination, the courts are to focus on the child, not the parent. In Re Adoption of C.L.G., 956 A.2d 999, 1008 (Pa. Super 2008) (*en banc*).

This Court finds competent evidence in the record that it is in A.L.'s best interests to terminate Appellant's parental rights and allow for her to be adopted by her current caregivers. The record contains evidence that Appellant knew about the Child before she was born, but refused to put himself forth as a parental figure in her life until the Agency had already begun the process of finalizing the Child's permanency with substitute caregivers, and after the Child had already been with foster parents for over a year. There was nothing in the record to suggest that Appellant's circumstances prevented him from

seeing the Child or being a part of the Child's life at any point in time. Despite Appellant having several months of visits and opportunity to progress in his parenting role with the Child, there was testimony from multiple parties that the Child is not bonded to Appellant.

By contrast, there was testimony from multiple parties that A.L. and her caregivers have a strong bond. The T. ,i s have had the Child in their home since she was 4½ months old, and have provided for all of her daily physical, medical, and emotional needs since then. The Child is now two years old, and is safe, happy, and bonded with the T. family as if they were her natural family. The caregivers are appropriately caring for the Child in their home, and wish to adopt the Child. The caregivers are also willing to maintain connections with the child's biological family. The child's guardian *ad litem* stated that the Child is doing well and is happy in the home and recommended that the Appellant's rights should be terminated.

Though Appellant wishes to have custody of the Child, he has been unable or unwilling to make the progress necessary on his parenting goals to do so, and A.L. needs stability and permanency that Appellant cannot provide. The T. s have proven themselves capable of providing the stability, love, and security A.L. needs for her overall well-being. This Court agrees with the Agency's position that it is in the best interest of the Child to terminate parental rights and allow for adoption. The Agency has proven, by clear and convincing evidence, that it is in the best interests of the child to allow for a termination of parental rights under 23 Pa.C.S.A. §2511(b). Noting substantial overlap in the facts and discussion regarding the Child's best interests as stated above, this Court now briefly turns to Appellant's last two arguments regarding its decision to change the Child's permanency goal to adoption.

c. Goal Change to Adoption and Appellant's Progress

When considering a petition for a goal change to adoption of a dependent child, the trial court will evaluate:

43

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances that necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and a likely date by which the goal for the child might be achieved.

In Interest of A.N.P., 155 A.3d 55, 66 (Pa. Super 2017) (internal citations omitted).

Although reunification of the family is the primary permanency goal, the Juvenile Act mandates the arrangement of "another alternative permanent family when the unity of the family cannot be maintained." 42 Pa.C.S.A. §6301(b). Accordingly, reuniting a Child with his or her biological parent(s) rather than changing the goal to adoption should not become "rigid adherence to the principle regardless of the circumstances." In re J.S.W., 651 A.2d 167, 170 (Pa. Super 1994). Changing a child's goal to adoption is based on the policy that "[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." In re Adoption of M.E.P., 825 A.2d 1266, 1276 (Pa. Super. 2003). If a child welfare Agency has made reasonable efforts at reunification that have failed, then within 18 months, the Agency must redirect its efforts toward *finalizing* permanency for the Child in an adoptive home. In re G.P.-R., 851 A.2d 967 (Pa. Super. 2004) (emphasis added). The trial court looks to subsections 6351(e), (f), (f.1), and (g) of the Juvenile Act[77] to determine the permanency goal that is "best suited to the safety, protection, and physical, mental, and moral welfare of the Child." In Interest of A.N.P., 155 A.3d at 67. The best interests of the Child must direct the Court's reasoning, and the "[s]afety, permanency, and well-being of the child must take precedence over *all* other considerations, including the rights of the parents." In re A.K., 906 A.2d 596 (Pa. Super. 2006); In re N.C., 909 A.2d 818, 823 (Pa. Super 2006) (emphasis in original).

Appellant's arguments complaining that the Child's goal change to adoption was inappropriate as a matter of law are without merit. The Appellant argues that the Court

---

[77] See 42 Pa.C.S.A. §6351.

44

erred in finding reasonable efforts to place the Child with him had failed, and that Appellant had made minimal progress toward alleviating the circumstances that made the Child's original placement necessary.

As this Court has already stated in the sections above, the record contains ample evidence to show that the Agency made reasonable efforts over several months to identify, locate, work with, and provide services to Appellant to help him reunify with A.L. Because Appellant had never met the Child prior to April 2017, it was essential for Appellant's visitation with A.L. to be supervised until the Child would be emotionally and physically safe in his care. During this process of attempted reunification, there were several times when Appellant was uncooperative with the Agency and the service providers in working toward his service plan goals, when he missed visits with the Child, and where he would be *incommunicado* for long periods of time. There was also testimony that Appellant did not take advantage of the opportunity to work with the foster parents to have visits or contact with the Child between visits at ABC. With all the supports and services that were in place for Appellant between the time he learned of his paternity and the time his rights were terminated, there was sufficient opportunity for a parental bond to be created with the Child and for Appellant to make significant progress on his service plan goals. As the record indicates, this did not happen.

Although a parent's rights to his Child are important, ultimately, it is the best interests of the Child that must guide this Court's reasoning and take precedence over all other considerations when considering a change in the Child's permanency goal. Here, it is in the best interests of the Child to change the goal to adoption. A.L. currently resides with the only family she has ever known, and has been with them for the vast majority of her life. Appellant has not made significant progress in his relationship with the Child or in meeting his service plan goals. It is also clear that the Child needs permanency at this point in her life to prevent her from languishing in foster care long-term until Appellant can someday prove himself capable of being her full-time parent. In addition, the testimony that the caregivers are willing to maintain visits and contact with Appellant

45

cuts against any argument that the Child will be detrimentally affected by a termination of Appellant's parental rights.

This Court considered all the factors and decided that the change of goal to adoption would be best suited to the needs and well-being of the Child. In this case, foster care has continued to be necessary for A.L., as Appellant has not taken the steps to establish a bond with her, provide for her, or be her full-time parent. Appellant has not done anything to alleviate the circumstances that initially brought the Child into care, namely, being without essential parental care and control. Appellant has not made the required progress on his service plan goals to achieve this purpose despite having had several months with Agency resources and support at his disposal to do so. This Court determined after a consideration of all the evidence that reunification was no longer feasible because Appellant would not be able to take full-time custody of the Child within a reasonable time, the Child has been in care for twenty-two months, and the Child needs and deserves to have permanency. This Court also considered that at this point, it would be detrimental for the Child's physical and emotional well-being to be taken out of the home of her caregivers, who have – for all intents and purposes – been her family for almost all her life, to be placed with Appellant, a virtual stranger to her. It is for these reasons that this Court believes that Appellant's third and fourth arguments must fail.

## CONCLUSION

This Court finds the issues raised by Appellant on appeal are without merit. For the reasons articulated in the above opinion, this Court respectfully requests the Superior Court of Pennsylvania to affirm this Court's Orders granting the Agency's Petitions for a Goal Change to Adoption and Involuntary Termination of Parental Rights of Appellant, R       W

BY THE COURT,

_Christylee L. Peck_

Christylee L. Peck,,                    J.

46